UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| MICHAEL WILLIAMSON,<br><br>           Plaintiff,<br><br>v.<br><br>AVIDIA BANCORP, INC., and KEEFE, BRUYETTE & WOODS, INC.,<br><br>           Defendants. | Civil Action No. _____<br><br>**COMPLAINT AND DEMAND FOR JURY TRIAL** |

Michael Williamson ("Plaintiff" or "Mr. Williamson") for his Complaint against Avidia Bancorp, Inc. ("Avidia") and Keefe, Bruyette & Woods, Inc. ("KBW") (collectively, "Defendants"), alleges as follows:

## NATURE OF THE ACTION

1. This complaint arises out of Defendants Avidia and KBW's efforts to obstruct and interfere with Plaintiff's right to purchase Avidia stock. Avidia formed a valid and enforceable contract with Plaintiff but subsequently ignored its obligations under that contract and refused to perform. KBW, an investment bank hired by Avidia to service the stock offering, pretended they never received Plaintiff's order so they could sell his shares to others for higher fees.

2. For over a decade, Plaintiff has been a depositor in Avidia Bank, a mutual bank owned by its depositors in Hudson, Massachusetts. When Avidia Bank sought to convert into a corporation owned by shareholders in 2025, Plaintiff had about $15,600 on deposit. Avidia Bank offered depositors, including Plaintiff, an opportunity to purchase stock at a discounted price through an initial offering (the "Subscription Offering") by Avidia Bancorp, Inc., the bank's proposed stock holding company.

3.  Despite Plaintiff's compliance with the procedures laid out in the offering, Defendants pretended they never received his order, returning his stock order form and checks in a ripped open envelope to the U.S. Post Office ("USPS") three days after the purchasing deadline. Defendants ignored Plaintiff's right to participate in the highly profitable Subscription Offering, costing him over $100,000 in lost profits.

4.  The Federal Deposit Insurance Corporation (the "FDIC") has recognized that transactions of this kind, known as "mutual-to-stock" conversions, create "concerns about insiders and investors . . . regarding excessive benefits from the transaction." Specifically, "[e]xcessive compensation packages for insiders," which "unjustly enrich insiders . . . to the detriment of depositors." For years, the FDIC has "closely reviewed" mutual-to-stock conversions "to ensure that . . . the value is distributed to the proper constituents of the mutual bank," like Mr. Williamson.

5.  Defendants, as insiders, did just what the FDIC warned about: unjustly enriching themselves at Plaintiff's expense. Both Avidia and KBW profited from ignoring Plaintiff's right to purchase Avidia stock. Avidia was able to raise more capital because any unclaimed shares allocated to Plaintiff in the Subscription Offering could be sold at a higher price to others. And according to the agreement between KBW and Avidia, KBW would be compensated *four times as much* if the shares Plaintiff sought to purchase were instead sold privately to certain financial institutions.

6.  Despite Plaintiff's good faith effort to resolve this dispute privately, Defendants have failed to acknowledge his rights or compensate him for the harm they caused, leaving Plaintiff no choice but to file this lawsuit.

2

## JURISDICTION & VENUE

7. This Court has original jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(1), because the amount in controversy exceeds $75,000, exclusive of interest and costs, and the action is between citizens of different states. Plaintiff is a citizen of New Hampshire while Defendant Avidia is incorporated in Maryland and has its principal place of business in Massachusetts, and Defendant KBW is incorporated and has its principal place of business in New York. Further, this Court has personal jurisdiction over the Defendants because Avidia is based in Massachusetts, and KBW was hired by Avidia as its agent to service its stock offering.

8. Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(2), because a substantial part of the events or omissions giving rise to the claim occurred in this district.

## PARTIES

9. Plaintiff Michael Williamson is an American citizen who resides in Sharon, New Hampshire. Plaintiff held about $15,600 in a deposit account at Avidia Bank prior to their proposed mutual-to-stock conversion and has suffered significant damages resulting from Defendants' actions depriving him of his priority rights to participate in the Subscription Offering.

10. Defendant Avidia is a corporation that is incorporated in Maryland and has its principal place of business in Hudson, Massachusetts. Avidia filed a Form S-1 with the Securities and Exchange Commission ("SEC") on or around March 14th, 2025, announcing its intention to commence the Subscription Offering.

11. Defendant KBW is incorporated and has its principal place of business in New York. KBW is an investment bank and registered broker-dealer retained by Avidia to service its mutual-to-stock conversion.

## FACTS

### I. The Process of Mutual-to-Stock Bank Conversions.

12. A mutual-to-stock conversion happens when a mutual bank "converts" its legal structure into a stock-based company. In a mutual bank, there are no outside shareholders; rather, customers collectively own the bank. In a stock-based company, ownership is represented by shares that can be traded on the market.

13. Banks convert from a mutual bank to a stock-based bank primarily to raise capital more easily. A mutual bank cannot issue stock to grow or make acquisitions; it must rely on retained earnings generated from the banking activities of its depositors. By becoming a stock-based company, it can sell shares to investors to raise capital and offer employees stock-based compensation, aligning employee incentives with corporate performance.

14. The process is heavily regulated and typically requires approval from the bank's board, regulators (like the FDIC or OCC), and the depositors themselves. Banks file a Form S-1 with the SEC to announce their intention to commence their mutual-to-stock conversion and the terms of their initial stock offering.

15. Depositors are given the first opportunity to buy shares in the new stock offering, usually at a discounted price. Any shares left over after the depositors may be sold to the public in a subsequent offering, or to institutions.

16. After conversion, the bank becomes a shareholder-driven institution accountable to investors. In essence, a mutual-to-stock conversion marks a bank's transition from *community-owned* to *market-owned*, changing both its governance and strategic priorities.

17. The mutual-to-stock conversion is usually managed by an outside investment bank who organizes the stock sales on behalf of the bank. Customarily, the investment bank

profits from the transaction by earning a success fee, often a percentage of the total offering value.

## II.     Plaintiff Exercised His Rights to Purchase Avidia Stock.

18.    For at least a decade, Plaintiff has been a depositor at Avidia Bank, previously a Massachusetts mutual bank owned by its depositors.

19.    On or around March 14, 2025, Defendant Avidia filed Form S-1 with the SEC, announcing its intention to commence their mutual-to-stock conversion and the Subscription Offering.

20.    Subsequently, Plaintiff learned that Avidia Bank sought to convert from a mutual bank owned by its depositors into a corporation owned by its shareholders. Avidia informed depositors, including Plaintiff, of their priority rights in the Subscription Offering. Plaintiff received a prospectus advertising the Subscription Offering and a stock order form in the mail from Avidia. According to the prospectus, Plaintiff was entitled to purchase up to 40,000 shares at $10.00 per share.

21.    On June 9, 2025, Plaintiff sent a package via the USPS to KBW's office in Morriston, NJ, following the instructions on the stock order form. The package contained a completed stock order form and a smaller sealed envelope containing two checks totaling $400,000 as payment for 40,000 shares of Avidia.

22.    The package was addressed to Avidia Bancorp and KBW.

23.    According to the stock order form, stock orders had to be received by KBW "on or before 2:00 p.m., Eastern time, on" June 17, 2025 to be accepted.

24. According to the USPS, Plaintiff's package was properly delivered to the ordering office in Morristown, NJ at 6:47 PM on June 16, 2025, more than nineteen hours before the ordering deadline.

25. Five days later, on June 21, 2025, USPS indicated that the package was returned to sender.

26. On or around June 22, 2025, Plaintiff received the package at his home in Sharon, New Hampshire.

27. The returned package had been opened and resealed. The sealed envelope inside the package containing the checks had also been opened.

28. On July 27, 2025, Plaintiff filed a complaint with the USPS Office of Consumer Affairs.

29. On August 18, 2025, Plaintiff visited the post office in Morristown, NJ to inquire about why his package had been returned.

30. At the post office, a postal employee confirmed that the package was delivered to Defendants' ordering office on June 16, 2025, but the delivery was subsequently returned to USPS and the package returned to Plaintiff.

31. Due to the high number of depositors seeking to purchase shares in Avidia, the Subscription Offering was oversubscribed. As a result, eligible depositors including Plaintiff were allocated 1.8 shares for every dollar they had on deposit at Avidia Bank. This allocation was done consistent with the terms and conditions described in the prospectus. Therefore, if Plaintiff's stock order form had been correctly processed, he would have been allocated 28,080 shares of Avidia at $10.00 per share, for a total purchase price of $280,800.

### III. Defendants Ignored Plaintiff's Rights to Purchase Avidia Stock.

32. KBW was retained by Avidia as "as their exclusive financial advisor and marketing agent to utilize its best efforts to solicit subscriptions for the Shares and to advise and assist the Avidia Parties with respect to the Company's sale of the Shares in the Offering."

33. The address of the ordering office listed on the stock order form indicated that any packages sent there would be under the care of KBW.

34. Defendants received Plaintiff's package and opened the exterior postal envelope and interior order form envelope.

35. Instead of processing Plaintiff's order, Defendants knew it was a stock order form, ignored it and returned it to Plaintiff.

### IV. Defendants Enriched Themselves at Plaintiff's Expense.

36. Pursuant to KBW's agreement with Avidia to service this transaction, they were compensated a "success fee" based on the total value of stock sold. For any stock sold in the Subscription Offering, KBW would receive a fee of 1.25% of the total offering amount. KBW and Avidia's contract contemplated the possibility of two additional sales, one to the public (the "Community Offering") and another to certain financial institutions. KBW was entitled to a 3% fee on shares sold in the Community Offering, and a staggering 5% fee on shares sold to financial institutions. By ignoring Plaintiff's stock order, KBW could earn thousands more in fees—up to four times as much.

37. While Avidia offered stock in the Subscription Offering at a discounted rate of $10.00 per share, they could increase the share price in any subsequent offerings, resulting in a larger capital raise. As of the filing of this Complaint, the public market values one share of Avidia stock at over $14.00.

7

38.     Consistent with the process required by M.G.L. c. 93A, on September 18, 2025, Plaintiff sent each Defendant a demand letter describing the unfair and deceptive business practices carried out by the Defendants and demanding relief.

39.     Both Defendants sent a response letter to Plaintiff wholly rejecting Plaintiff's demand.

**COUNT I**
**BREACH OF CONTRACT**
**(Against Defendant Avidia)**

40.     Plaintiff realleges each of the allegations contained in the paragraphs above as if stated fully herein.

41.     The stock order form that Defendant Avidia sent to Plaintiff was an offer to purchase Avidia stock for $10.00 per share. According to the order form's terms, Plaintiff could accept the offer by returning the order form before the June 17, 2025 deadline by mail to the ordering office in New Jersey or by hand delivery to Avidia's headquarters in Massachusetts with full payment.

42.     When Defendant Avidia, through its agent KBW, opened Plaintiff's package at the ordering office in New Jersey, it was confronted with Plaintiff's unmistakable acceptance: a completed stock order form and two checks totaling $400,000.

43.     At that moment, Defendant Avidia's offer was accepted and a contract was formed.

44.     Defendant Avidia breached its contract with Plaintiff by refusing to process his stock order.

45.     As a result of this breach, Plaintiff suffered damages in an amount to be proved at trial but in no case less than $168,199.20.

## COUNT II
## BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

46.     Plaintiff realleges each of the allegations contained in the paragraphs above as if stated fully herein.

47.     The totality of the circumstances indicates Defendant Avidia's lack of good faith and fair dealing with respect to Plaintiff. Avidia lacked good faith when it failed to process Plaintiff's stock order, refusing to recognize Plaintiff's rights as a depositor in and owner of Avidia Bank. Defendant again lacked good faith by failing to notify Plaintiff that his stock order form would not be processed, which would have enabled him to place his order in person at Avidia's headquarters in Massachusetts before the June 17, 2025 deadline. In all, Defendant Avidia's refusal to perform under its contract with Plaintiff reflected a lack of good faith and fair dealing.

48.     Defendant Avidia's actions with respect to Plaintiff effectively destroyed his right to enjoy the fruits of their contract, causing him to lose his ownership stake in Avidia and denied him the benefit of the bargain.

## COUNT III
## PROMISSORY ESTOPPEL

49.     Plaintiff realleges each of the allegations contained in the paragraphs above as if stated fully herein.

50.     Defendant Avidia should be estopped from failing to abide by its promise to accept order forms and payment by mail to the ordering office in New Jersey.

51.     In the stock order form Defendant Avidia sent to Plaintiff, Avidia clearly and definitely promised to accept order forms received in person at its Massachusetts headquarters or by mail at its New Jersey ordering office before 2:00pm on June 17, 2025.

52. Defendant Avidia knew depositors would rely on its promise to accept order forms by mail and in person. Avidia reasonably expected depositors to mail their order forms based on its promise to accept them, which is why it set up not just a mailbox, but an entire ordering office to receive and process orders in New Jersey.

53. Plaintiff reasonably relied on Defendant Avidia's promise and mailed his completed form and payment to its New Jersey ordering office.

54. Avidia's choice to renege on its promise to accept Plaintiff's order prevented him from participating in the highly profitable Subscription Offering.

55. Had Defendant Avidia never promised to accept orders by mail, Plaintiff would have hand delivered his stock order form at Defendant's Massachusetts headquarters before the June 17, 2025 deadline.

56. The only way to vindicate Plaintiff's rights as a depositor and owner is to require Defendant Avidia to fully compensate Plaintiff for the harm they have caused.

## COUNT IV
## INTENTIONAL INTERFERENCE WITH PROSPECTIVE ECONOMIC RELATIONSHIP
### (Against Defendant KBW)

57. Plaintiff realleges each of the allegations contained in the paragraphs above as if stated fully herein.

58. Plaintiff had priority rights in Defendant Avidia's Subscription Offering, constituting a prospective economic relationship.

59. Defendant KBW knowingly and intentionally returned Plaintiff's completed stock order form instead of processing it, preventing Plaintiff from participating in the Subscription Offering and thereby interfering in his prospective relationship with Defendant Avidia.

10

60.     Defendant KBW knew of Plaintiff's prospective relationship with Defendant Avidia because only qualified depositors could place orders in the Subscription Offering.

61.     Defendant KBW's interference in this relationship was intentional because it opened not only the exterior postal envelope, but also the interior envelope containing Plaintiff's order form. Thus, KBW clearly saw Plaintiff's completed order form and two checks totaling $400,000.

62.     Defendant KBW was motivated to interfere with Plaintiff and Avidia's relationship because it stood to earn up to *four times* as much if the shares allocated to Plaintiff by right were instead sold to the public or certain financial institutions.

63.     Defendant KBW's actions harmed Plaintiff by obstructing and interfering with his rights as a depositor and cutting him out of a transaction that would have generated over $100,000 in profit as of the filing of this suit.

## COUNT V
## INTENTIONAL INTERFERENCE WITH CONTRACTUAL RELATIONS
### (Against Defendant KBW)

64.     Plaintiff realleges each of the allegations contained in the paragraphs above as if stated fully herein.

65.     Defendant Avidia and Plaintiff had a contract with potential for economic benefit. Plaintiff stood to benefit economically if the share price of Avidia increased above $10.00 because his shares would then be worth more than he paid for them.

66.     Defendant KBW knew of the contract between Avidia and Plaintiff because KBW operated the ordering office in New Jersey where Plaintiff's order form and payment was delivered and opened.

11

67.     Defendant KBW intentionally interfered with Plaintiff's contract with Avidia to improperly enrich itself. KBW opened both Plaintiff's exterior postal envelope and the interior order form envelope, containing the completed order form and two checks totaling $400,000. Nevertheless, Defendant KBW refused to process Plaintiff's order.

68.     Defendant KBW stood to benefit from interfering with the contract between Plaintiff and Avidia. Specifically, KBW earned 3-5% in fees on shares sold to the public or certain financial institutions compared to only 1.25% on shares sold in the Subscription Offering. With respect to Plaintiff's shares alone, KBW stood to earn up to $14,040 in fees if the shares were sold to the public or certain financial institutions, but only $3,510 had it processed Plaintiff's order.

69.     Defendant KBW's actions harmed Plaintiff by obstructing and interfering with his rights as a depositor and cutting him out of a transaction that would have generated over $100,000 in profit as of the filing of this suit.

## COUNT VI
## UNFAIR AND DECEPTIVE BUSINESS PRACTICES (M.G.L. c. 93A)
(Against Defendants Avidia and KBW)

70.     Plaintiff realleges each of the allegations contained in the paragraphs above as if stated fully herein.

71.     Defendants Avidia and KBW's conduct falls under the shadow of some established concept of unfairness.

72.     The allegations underlying Plaintiff's claims against Defendant Avidia for breach of contract, breach of the implied covenant of good faith and fair dealing, and promissory estoppel are all allegations of unfair business practices, and each of those causes of actions represents an established concept of unfairness.

73.     The allegations underlying Plaintiff's claims against Defendant KBW for intentional interference are, similarly, all allegations of unfair business practices, and each of those causes of actions represents an established concept of unfairness.

74.     Defendants' actions were immoral, unethical, and unscrupulous. Defendants each chose to ignore Plaintiff's rightful stock order to enrich themselves, which is immoral, unethical, and unscrupulous.

75.     Defendants' actions were also oppressive. Both Avidia and KBW leveraged their dominant financial position relative to Plaintiff, a private individual who merely sought to capitalize on his rights as a depositor in Avidia Bank, to enrich themselves. Defendants knew that it was unlikely that a single depositor would have the resources to fully pursue their claims in court, so, they acted with impunity for their own benefit, at the direct expense of Plaintiff.

76.     Plaintiff, a customer and owner of Avidia Bank, was substantially injured. Defendants Avidia and KBW's actions prevented Plaintiff from receiving the benefit of the contract he entered or from otherwise participating in the Subscription Offering as was his right. Because Avidia's stock price has increased substantially since the Subscription Offering, Plaintiff has lost out on over $100,000 in returns.

77.     Consistent with the process required by M.G.L. c. 93A, Plaintiff sent demand letters to both Defendants over thirty days ago. Both Defendants denied Plaintiff's demand for relief.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Michael Williamson demands:

1. Judgment in favor of Plaintiff and against Avidia and KBW on all Counts;

2. Damages in an amount to be proved at trial, including pre-award and post-award interest, but in no case less than $168,199.20; and

3. Such other relief at law or equity that the Court deems just and proper.

Dated: October __, 2025

By: _____
Michael Williamson
41 Temple Road
Sharon, NH 03458
T: 978-621-6369
mikewillie24@gmail.com
*Proceeding Pro Se*
