UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| MICHAEL WILLIAMSON, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. 1:25-cv-13410-AK |
| | ) |
| AVIDIA BANCORP, INC. and KEEFE, | ) |
| BRUYETTE & WOODS, INC., | ) |
| | ) |
| Defendants. | ) |
| | ) |

**ANSWER OF DEFENDANT AVIDIA BANCORP, INC. TO PLAINTIFF'S
AMENDED COMPLAINT**

Defendant Avidia Bancorp, Inc. ("Avidia") hereby responds to Plaintiff's Amended

Complaint as follows:

**NATURE OF THE ACTION**

1.      This complaint arises out of Defendants Avidia and KBW's efforts to obstruct and

interfere with Plaintiff's right to purchase Avidia stock. Avidia formed a valid and enforceable

contract with Plaintiff but subsequently ignored its obligations under that contract and refused to

perform. KBW, an investment bank hired by Avidia to service the stock offering, pretended they

never received Plaintiff's order so they could sell his shares to others for higher fees.

ANSWER:      Avidia denies the allegations in Paragraph 1.

2.      For over a decade, Plaintiff has been a depositor in Avidia Bank, a mutual bank

owned by its depositors in Hudson, Massachusetts. When Avidia Bank sought to convert into a

corporation owned by shareholders in 2025, Plaintiff had about $15,600 on deposit. Avidia Bank

offered depositors, including Plaintiff, an opportunity to purchase stock at a discounted price

through an initial offering (the "Subscription Offering") by Avidia Bancorp, Inc., the bank's

proposed stock holding company.

ANSWER:   Avidia admits the allegations in the first and second sentences of Paragraph 2, except Avidia clarifies that, at the time of its mutual-to-stock conversion, Plaintiff had approximately $15,549.43 on deposit at Avidia. In response to the allegations in the third sentence in Paragraph 2, Avidia admits that it offered depositors, including Plaintiff, an opportunity to purchase stock through an initial offering. Avidia otherwise denies the remaining allegations in the third sentence of Paragraph 2. Except as admitted, the allegations in Paragraph 2 are denied.

3.   Despite Plaintiff's compliance with the procedures laid out in the offering, Defendants pretended they never received his order, returning his stock order form and checks in a ripped open envelope to the U.S. Post Office ("USPS") three days after the purchasing deadline. Defendants ignored Plaintiff's right to participate in the highly profitable Subscription Offering, costing him over $100,000 in lost profits.

ANSWER:   Avidia denies the allegations in Paragraph 3.

4.   The Federal Deposit Insurance Corporation (the "FDIC") has recognized that transactions of this kind, known as "mutual-to-stock" conversions, create "concerns about insiders and investors . . . regarding excessive benefits from the transaction." Specifically, "[e]xcessive compensation packages for insiders," which "unjustly enrich insiders . . . to the detriment of depositors." For years, the FDIC has "closely reviewed" mutual-to-stock conversions "to ensure that . . . the value is distributed to the proper constituents of the mutual bank," like Mr. Williamson.

ANSWER:   The allegations in Paragraph 4 contain statements and conclusions of law, to which no response is required. To the extent a response is required, Avidia admits that Paragraph 4 quotes from the FDIC's Applications Procedures Manual. Further responding,

2

Avidia denies that it violated any FDIC or other applicable law, rule, regulation, or guidance, and denies that Mr. Williamson suffered any harm. Except as admitted, the allegations in Paragraph 4 are denied.

5.    Defendants, as insiders, did just what the FDIC warned about: unjustly enriching themselves at Plaintiff's expense. Both Avidia and KBW profited from ignoring Plaintiff's right to purchase Avidia stock. Avidia was able to raise more capital because any unclaimed shares allocated to Plaintiff in the Subscription Offering could be sold at a higher price to others. And according to the agreement between KBW and Avidia, KBW would be compensated *four times as much* if the shares Plaintiff sought to purchase were instead sold privately to certain financial institutions.

ANSWER:    Avidia denies the allegations in Paragraph 5.

6.    Despite Plaintiff's good faith effort to resolve this dispute privately, Defendants have failed to acknowledge his rights or compensate him for the harm they caused, leaving Plaintiff no choice but to file this lawsuit.

ANSWER:    Avidia denies the allegations in Paragraph 6.

### JURISDICTION & VENUE

7.    This Court has original jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(1), because the amount in controversy exceeds $75,000, exclusive of interest and costs, and the action is between citizens of different states. Plaintiff is a citizen of New Hampshire while Defendant Avidia is incorporated in Maryland and has its principal place of business in Massachusetts, and Defendant KBW is incorporated and has its principal place of business in New York. Further, this Court has personal jurisdiction over the Defendants because Avidia is based in Massachusetts, and KBW was hired by Avidia as its agent to service its stock offering.

ANSWER:    With respect to the allegations in the first and last sentences of Paragraph 7, those allegations contain statements and conclusions of law, to which no response is required. To the extent a response is required, Avidia admits that this Court has jurisdiction over Mr. Williamson's claims against Avidia in this action. Except as admitted, the allegations in the first and last sentences of Paragraph 7 are denied. Further responding, Avidia is without knowledge or information sufficient to form a belief as to the truth of the allegations in the second sentence of Paragraph 7. Except as admitted, the allegations in Paragraph 7 are denied.

8.    Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(2), because a substantial part of the events or omissions giving rise to the claim occurred in this district.

ANSWER:    The allegations in Paragraph 8 contain statements and conclusions of law, to which no response is required. To the extent a response is required, Avidia admits that this district is a proper venue for Plaintiff's claims against Avidia in this action.

## **PARTIES**

9.    Plaintiff Michael Williamson is an American citizen who resides in Sharon, New Hampshire. Plaintiff held about $15,600 in a deposit account at Avidia Bank prior to their proposed mutual-to-stock conversion and has suffered significant damages resulting from Defendants' actions depriving him of his priority rights to participate in the Subscription Offering.

ANSWER:    Avidia is without knowledge or information sufficient to form a belief as to the truth of  Paragraph 9's allegations concerning Plaintiff's residence. Avidia admits that Plaintiff held approximately $15,549.43 in a deposit account at Avidia Bank before its mutual-to-stock conversion.  Avidia denies the remaining allegations in Paragraph 9.

10.    Defendant Avidia is a corporation that is incorporated in Maryland and has its principal place of business in Hudson, Massachusetts. Avidia filed a Form S-1 with the Securities

4

and Exchange Commission ("SEC") on or around March 14th, 2025, announcing its intention to commence the Subscription Offering.

ANSWER:    Avidia admits the allegations in Paragraph 10.

11.    Defendant KBW is incorporated and has its principal place of business in New York. KBW is an investment bank and registered broker-dealer retained by Avidia to service its mutual-to-stock conversion.

ANSWER:    Avidia admits that KBW is incorporated and has its principal place of business in New York. KBW is an investment bank and registered broker-dealer retained by Avidia to manage its mutual-to-stock conversion. Except as admitted, the allegations in Paragraph 11 are denied.

## FACTS

### I.    The Process of Mutual-to-Stock Bank Conversions.

12.    A mutual-to-stock conversion happens when a mutual bank "converts" its legal structure into a stock-based company. In a mutual bank, there are no outside shareholders; rather, customers collectively own the bank. In a stock-based company, ownership is represented by shares that can be traded on the market.

ANSWER:    The allegations in Paragraph 12 contain statements and conclusions of law, to which no response is required. To the extent a response is required, Avidia admits the allegations in Paragraph 12.

13.    Banks convert to stock-based companies primarily to raise capital more easily. A mutual bank cannot issue stock to grow or make acquisitions; it must rely on retained earnings generated from the banking activities of its depositors. By becoming a stock-based company, it can sell shares to investors to raise capital and offer employees stock-based compensation, aligning employee incentives with corporate performance.

ANSWER:    The allegations in Paragraph 13 contain statements and conclusions of law, to which no response is required. To the extent a response is required, Avidia states that it is without knowledge or information sufficient to form a belief as to the allegations in the first sentence of Paragraph 13. Further responding, Avidia admits that the remaining allegations in Paragraph 13 are an accurate, but incomplete, general description of mutual banks and mutual-to-stock conversions. Except as admitted, the allegations in Paragraph 13 are denied.

14.    The process is heavily regulated and typically requires approval from the bank's board, regulators (like the FDIC), and the depositors themselves. Banks file a Form S-1 with the SEC to announce their intention to commence their mutual-to-stock conversion and the terms of their initial stock offering.

ANSWER:    Avidia admits that the allegations in Paragraph 14 are an accurate, but incomplete, general description of the mutual-to-stock conversion process. Except as admitted, the allegations in Paragraph 14 are denied.

15.    Depositors are given the first opportunity to buy shares in the new stock offering, usually at a discounted price. Any shares left over after the depositors may be sold to the public in a subsequent offering, or to institutions.

ANSWER:    Avidia admits that the allegations in Paragraph 15 are an accurate, but incomplete, general description of the mutual-to-stock conversion process. Except as admitted, the allegations in Paragraph 15 are denied.

16.    After conversion, the bank becomes a shareholder-driven institution accountable to investors. In essence, a mutual-to-stock conversion marks a bank's transition from *community-owned* to *market-owned*, changing both its governance and strategic priorities.

ANSWER:    Avidia denies the allegations in Paragraph 16.

17.     The mutual-to-stock conversion is usually managed by an outside investment bank who organizes the stock sales on behalf of the bank. Customarily, the investment bank profits from the transaction by earning a success fee, often a percentage of the total offering value.

ANSWER:     Avidia admits that the allegations in the first sentence of Paragraph 17 are an accurate, but incomplete, general description of the mutual-to-stock conversion process. Avidia is without knowledge or information sufficient to form a belief as to the remaining allegations in Paragraph 17. Except as admitted, the allegations in Paragraph 17 are denied.

## II.     Plaintiff Exercised His Rights to Purchase Avidia Stock.

18.     For at least a decade, Plaintiff has been a depositor at Avidia Bank, previously a Massachusetts mutual bank owned by its depositors.

ANSWER:     Avidia admits the allegations in Paragraph 18.

19.     On or around March 14, 2025, Defendant Avidia filed Form S-1 with the SEC, announcing its intention to commence their mutual-to-stock conversion and the Subscription Offering.

ANSWER:     Avidia admits the allegations in Paragraph 19.

20.     Subsequently, Plaintiff learned that Avidia Bank sought to convert from a mutual bank owned by its depositors into a corporation owned by its shareholders. Avidia informed depositors, including Plaintiff, of their priority rights in the Subscription Offering. Plaintiff received a prospectus advertising the Subscription Offering and a stock order form in the mail from Avidia. According to the prospectus, Plaintiff was entitled to purchase up to 40,000 shares at $10.00 per share.

ANSWER:     Avidia admits the allegations in Paragraph 20.

7

21.     On June 9, 2025, Plaintiff sent a package via the USPS to KBW's office in Morriston, NJ, following the instructions on the stock order form. The package contained a completed stock order form and a smaller sealed envelope containing two checks totaling $400,000 as payment for 40,000 shares of Avidia.

ANSWER:     Avidia denies the allegations in Paragraph 21.

22.     While the envelope contained a single-digit error in the address (309 Madison Avenue instead of 305 Madison Avenue) it listed the correct street, town, state and, importantly, the name of the recipient: Avidia and KBW. Further, there was no 309 Madison Avenue, and the closest actual address was 305 Madison Avenue.

ANSWER:     Avidia admits that Plaintiff addressed the envelope to the incorrect address. Avidia denies the remaining allegations in Paragraph 22.

23.     According to the stock order form, stock orders had to be received by KBW "on or before 2:00 p.m., Eastern time, on" June 17, 2025 to be accepted.

ANSWER:     Avidia admits the allegations in Paragraph 23.

24.     According to the USPS, Plaintiff's package was properly delivered to the ordering office in Morristown, NJ at 6:47 PM on June 16, 2025, more than nineteen hours before the ordering deadline.

ANSWER:     Avidia is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 24.

25.     Five days later, on June 21, 2025, USPS indicated that the package was returned to sender.

ANSWER:     Avidia is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 25.

26.    On or around June 22, 2025, Plaintiff received the package at his home in Sharon, New Hampshire.

ANSWER:    Avidia is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 26.

27.    The returned package had been opened and resealed. The sealed envelope inside the package containing the checks had also been opened.

ANSWER:    Avidia is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 27.

28.    On July 27, 2025, Plaintiff filed a complaint with the USPS Office of Consumer Affairs.

ANSWER:    Avidia is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 28.

29.    On August 18, 2025, Plaintiff visited the post office in Morristown, NJ to inquire about why his package had been returned.

ANSWER:    Avidia is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 29.

30.    At the post office, a postal employee confirmed that the package was delivered to Defendants' ordering office on June 16, 2025, but the delivery was subsequently returned to USPS and the package returned to Plaintiff.

ANSWER:    Avidia is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 30.

31.    Due to the high number of depositors seeking to purchase shares in Avidia, the Subscription Offering was oversubscribed. As a result, eligible depositors including Plaintiff

9

were allocated 1.8 shares for every dollar they had on deposit at Avidia Bank. This allocation was done consistent with the terms and conditions described in the prospectus. Therefore, if Plaintiff's stock order form had been correctly processed, he would have been allocated 28,080 shares of Avidia at $10.00 per share, for a total purchase price of $280,800.

ANSWER:   Avidia admits the allegations in the first sentence of Paragraph 31. Further responding, Avidia admits that the allocation of shares to its depositors seeking to participate in the Subscription Offering was done in accordance with the terms and conditions in the prospectus. Further responding, Avidia states that it is without knowledge or information sufficient to form a belief as to exactly how many shares Plaintiff would have been entitled to had he mailed the stock order form to the correct address and if the Stock Information Center had received the stock order form before the June 17, 2025, 2:00 p.m. ET deadline. To the best of its knowledge and information, Avidia believes that Plaintiff may have been entitled to between 20,000 and 26,000 shares. Except as admitted, the allegations in Paragraph 31 are denied.

### III.   Defendants Ignored Plaintiff's Rights to Purchase Avidia Stock.

32.   KBW was retained by Avidia as "as their exclusive financial advisor and marketing agent to utilize its best efforts to solicit subscriptions for the Shares and to advise and assist the Avidia Parties with respect to the Company's sale of the Shares in the Offering."

ANSWER:   Avidia admits the allegations in Paragraph 32.

33.   The address of the ordering office listed on the stock order form indicated that any packages sent there would be under the care of KBW.

ANSWER:   Avidia admits that the Stock Order Form instructed depositors to mail their completed order forms, along with payment, to "Stock Information Center, c/o Keefe, Bruyette & Woods, 305 Madison Avene, 2nd Floor, Morristown, NJ 07960."

10

34.     Defendants received Plaintiff's package and opened the exterior postal envelope and interior order form envelope.

ANSWER:     Avidia denies the allegations in Paragraph 34.

35.     Instead of processing Plaintiff's order, Defendants knew it was a stock order form, ignored it and returned it to Plaintiff.

ANSWER:     Avidia denies the allegations in Paragraph 35.

## IV.     <u>**Defendants Enriched Themselves at Plaintiff's Expense.**</u>

36.     Pursuant to KBW's agreement with Avidia to service this transaction, they were compensated a "success fee" based on the total value of stock sold. For any stock sold in the Subscription Offering, KBW would receive a fee of 1.25% of the total offering amount. KBW and Avidia's contract contemplated the possibility of two additional sales, one to the public (the "Community Offering") and another to certain financial institutions. KBW was entitled to a 3% fee on shares sold in the Community Offering, and a staggering 5% fee on shares sold to financial institutions. By ignoring Plaintiff's stock order, KBW could earn thousands more in fees—up to four times as much.

ANSWER:     Avidia admits that it agreed to compensate KBW a success fee of 1.25% of the aggregate purchase price of common stock sold to Avidia depositors in the subscription offering, 3% of the aggregate purchase price of common stock sold in any subsequent "Community Offering," and 5% of the aggregate purchase price of common stock sold in any subsequent "Syndicated Community Offering." Avidia denies the remaining allegations in Paragraph 36.

37.     While Avidia offered stock in the Subscription Offering at a discounted rate of $10.00 per share, they could increase the share price in any subsequent offerings, resulting in a

11

larger capital raise. As of the filing of this Complaint, the public market values one share of Avidia stock at over $14.00.

ANSWER:    Avidia denies the allegations in Paragraph 37.

38.    Consistent with the process required by M.G.L. c. 93A, on September 18, 2025, Plaintiff sent each Defendant a demand letter describing the unfair and deceptive business practices carried out by the Defendants and demanding relief.

ANSWER:    Avidia admits that it received a demand letter from Plaintiff dated September 18, 2025.

39.    Both Defendants sent a response letter to Plaintiff wholly rejecting Plaintiff's demand.

ANSWER:    Avidia admits that it responded to Plaintiff's demand letter, rejecting Plaintiff's demand.

**COUNT I**
**BREACH OF CONTRACT**
**(Against Defendant Avidia)**

40.    Plaintiff realleges each of the allegations contained in the paragraphs above as if stated fully herein.

ANSWER:    Avidia incorporates by reference its answers to each of the paragraphs above, as if fully stated herein.

41.    The stock order form that Defendant Avidia sent to Plaintiff was an offer to purchase Avidia stock for $10.00 per share. According to the order form's terms, Plaintiff could accept the offer by returning the order form before the June 17, 2025 deadline by mail to the ordering office in New Jersey or by hand delivery to Avidia's headquarters in Massachusetts with full payment.

ANSWER:    Paragraph 41 contains statements and conclusions of law, to which no response is required. To the extent a response is required, Avidia admits that it sent its depositors, including Plaintiff, a Stock Order Form. Further responding, Avidia states that the Stock Order Form Speaks for itself. Except as admitted, the allegations in Paragraph 41 are denied.

42.    When Defendant Avidia, through its agent KBW, opened Plaintiff's package at the ordering office in New Jersey, it was confronted with Plaintiff's unmistakable acceptance: a completed stock order form and two checks totaling $400,000.

ANSWER:    Avidia denies the allegations in Paragraph 42.

43.    At that moment, Defendant Avidia's offer was accepted and a contract was formed.

ANSWER:    Avidia denies the allegations in Paragraph 43.

44.    Defendant Avidia breached its contract with Plaintiff by refusing to process his stock order.

ANSWER:    Avidia denies the allegations in Paragraph 44.

45.    As a result of this breach, Plaintiff suffered damages in an amount to be proved at trial but in no case less than $168,199.20.

ANSWER:    Avidia denies the allegations in Paragraph 45.

## COUNT II
## BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

46.    Plaintiff realleges each of the allegations contained in the paragraphs above as if stated fully herein.

ANSWER:    Avidia incorporates by reference its answers to each of the paragraphs above, as if fully stated herein.

13

47.    The totality of the circumstances indicates Defendant Avidia's lack of good faith and fair dealing with respect to Plaintiff. Avidia lacked good faith when it failed to process Plaintiff's stock order, refusing to recognize Plaintiff's rights as a depositor in and owner of Avidia Bank. Defendant again lacked good faith by failing to notify Plaintiff that his stock order form would not be processed, which would have enabled him to place his order in person at Avidia's headquarters in Massachusetts before the June 17, 2025 deadline. In all, Defendant Avidia's refusal to perform under its contract with Plaintiff reflected a lack of good faith and fair dealing.

ANSWER:    Avidia denies the allegations in Paragraph 47.

48.    Defendant Avidia's actions with respect to Plaintiff effectively destroyed his right to enjoy the fruits of their contract, causing him to lose his ownership stake in Avidia and denied him the benefit of the bargain.

ANSWER:    Avidia denies the allegations in Paragraph 48.

## COUNT III
## PROMISSORY ESTOPPEL

49.    Plaintiff realleges each of the allegations contained in the paragraphs above as if stated fully herein.

ANSWER:    Avidia incorporates by reference its answers to each of the paragraphs above, as if fully stated herein.

50.    Defendant Avidia should be estopped from failing to abide by its promise to accept order forms and payment by mail to the ordering office in New Jersey.

ANSWER:    Avidia denies the allegations in Paragraph 50.

14

51.     In the stock order form Defendant Avidia sent to Plaintiff, Avidia clearly and definitely promised to accept order forms received in person at its Massachusetts headquarters or by mail at its New Jersey ordering office before 2:00pm on June 17, 2025.

ANSWER:     Avidia denies the allegations in Paragraph 51.

52.     Defendant Avidia knew depositors would rely on its promise to accept order forms by mail and in person. Avidia reasonably expected depositors to mail their order forms based on its promise to accept them, which is why it set up not just a mailbox, but an entire ordering office to receive and process orders in New Jersey.

ANSWER:     Avidia admits that it knew depositors would rely on the information provided in the Stock Order Form and that some depositors would mail their order forms to the address listed on the form. Except as admitted, the allegations in Paragraph 52 are denied.

53.     Plaintiff reasonably relied on Defendant Avidia's promise and mailed his completed form and payment to its New Jersey ordering office.

ANSWER:     Paragraph 53 contains statements and conclusions of law, to which no response is required. To the extent a response is required, Avidia is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 53.

54.     Avidia's choice to renege on its promise to accept Plaintiff's order prevented him from participating in the highly profitable Subscription Offering.

ANSWER:     Avidia denies the allegations in Paragraph 54.

55.     Had Defendant Avidia never promised to accept orders by mail, Plaintiff would have hand delivered his stock order form at Defendant's Massachusetts headquarters before the June 17, 2025 deadline.

ANSWER:     Avidia denies the allegations in Paragraph 55.

56.    The only way to vindicate Plaintiff's rights as a depositor and owner is to require Defendant Avidia to fully compensate Plaintiff for the harm they have caused.

ANSWER:    Avidia denies the allegations in Paragraph 56.

**COUNT IV**
**INTENTIONAL INTERFERENCE WITH PROSPECTIVE ECONOMIC RELATIONSHIP**
**(Against Defendant KBW)**

57.    Plaintiff realleges each of the allegations contained in the paragraphs above as if stated fully herein.

ANSWER:    Avidia incorporates by reference its answers to each of the paragraphs above, as if fully stated herein.

58.    Plaintiff had priority rights in Defendant Avidia's Subscription Offering, constituting a prospective economic relationship.

ANSWER:    The allegations in Paragraph 58 are directed to defendant Keefe, Bruyette & Woods, Inc. Accordingly, no response from Avidia is required. To the extent a response is required, Avidia denies the allegations in Paragraph 58.

59.    Defendant KBW knowingly and intentionally returned Plaintiff's completed stock order form instead of processing it, preventing Plaintiff from participating in the Subscription Offering and thereby interfering in his prospective relationship with Defendant Avidia.

ANSWER:    The allegations in Paragraph 59 are directed to defendant Keefe, Bruyette & Woods, Inc. Accordingly, no response from Avidia is required. To the extent a response is required, Avidia denies the allegations in Paragraph 59.

60.    Defendant KBW knew of Plaintiff's prospective relationship with Defendant Avidia because only qualified depositors could place orders in the Subscription Offering.

ANSWER:    The allegations in Paragraph 60 are directed to defendant Keefe, Bruyette & Woods, Inc. Accordingly, no response from Avidia is required. To the extent a response is required, Avidia denies the allegations in Paragraph 60.

61.    Defendant KBW's interference in this relationship was intentional because it opened not only the exterior postal envelope, but also the interior envelope containing Plaintiff's order form. Thus, KBW clearly saw Plaintiff's completed order form and two checks totaling $400,000.

ANSWER:    The allegations in Paragraph 61 are directed to defendant Keefe, Bruyette & Woods, Inc. Accordingly, no response from Avidia is required. To the extent a response is required, Avidia denies the allegations in Paragraph 61.

62.    Defendant KBW was motivated to interfere with Plaintiff and Avidia's relationship because it stood to earn up to four times as much if the shares allocated to Plaintiff by right were instead sold to the public or certain financial institutions.

ANSWER:    The allegations in Paragraph 62 are directed to defendant Keefe, Bruyette & Woods, Inc. Accordingly, no response from Avidia is required. To the extent a response is required, Avidia denies the allegations in Paragraph 62.

63.    Defendant KBW's actions harmed Plaintiff by obstructing and interfering with his rights as a depositor and cutting him out of a transaction that would have generated over $100,000 in profit as of the filing of this suit.

ANSWER:    The allegations in Paragraph 63 are directed to defendant Keefe, Bruyette & Woods, Inc. Accordingly, no response from Avidia is required. To the extent a response is required, Avidia denies the allegations in Paragraph 63.

17

**COUNT V**
**INTENTIONAL INTERFERENCE WITH CONTRACTUAL RELATIONS**
**(Against Defendant KBW)**

64.     Plaintiff realleges each of the allegations contained in the paragraphs above as if stated fully herein.

ANSWER:     Avidia incorporates by reference its answers to each of the paragraphs above, as if fully stated herein.

65.     Defendant Avidia and Plaintiff had a contract with potential for economic benefit. Plaintiff stood to benefit economically if the share price of Avidia increased above $10.00 because his shares would then be worth more than he paid for them.

ANSWER:     Avidia denies the allegations in Paragraph 65.

66.     Defendant KBW knew of the contract between Avidia and Plaintiff because KBW operated the ordering office in New Jersey where Plaintiff's order form and payment was delivered and opened.

ANSWER:     The allegations in Paragraph 66 are directed to defendant Keefe, Bruyette & Woods, Inc. Accordingly, no response from Avidia is required. To the extent a response is required, Avidia denies the allegations in Paragraph 66.

67.     Defendant KBW intentionally interfered with Plaintiff's contract with Avidia to improperly enrich itself. KBW opened both Plaintiff's exterior postal envelope and the interior order form envelope, containing the completed order form and two checks totaling $400,000. Nevertheless, Defendant KBW refused to process Plaintiff's order.

ANSWER:     The allegations in Paragraph 67 are directed to defendant Keefe, Bruyette & Woods, Inc. Accordingly, no response from Avidia is required. To the extent a response is required, Avidia denies the allegations in Paragraph 67.

18

68.     Defendant KBW stood to benefit from interfering with the contract between Plaintiff and Avidia. Specifically, KBW earned 3-5% in fees on shares sold to the public or certain financial institutions compared to only 1.25% on shares sold in the Subscription Offering. With respect to Plaintiff's shares alone, KBW stood to earn up to $14,040 in fees if the shares were sold to the public or certain financial institutions, but only $3,510 had it processed Plaintiff's order.

ANSWER:     The allegations in Paragraph 68 are directed to defendant Keefe, Bruyette & Woods, Inc. Accordingly, no response from Avidia is required. To the extent a response is required, Avidia denies the allegations in Paragraph 68.

69.     Defendant KBW's actions harmed Plaintiff by obstructing and interfering with his rights as a depositor and cutting him out of a transaction that would have generated over $100,000 in profit as of the filing of this suit.

ANSWER:     The allegations in Paragraph 69 are directed to defendant Keefe, Bruyette & Woods, Inc. Accordingly, no response from Avidia is required. To the extent a response is required, Avidia denies the allegations in Paragraph 69.

## COUNT VI
## UNFAIR AND DECEPTIVE BUSINESS PRACTICES (M.G.L. c. 93A)
### (Against Defendants Avidia and KBW)

70.     Plaintiff realleges each of the allegations contained in the paragraphs above as if stated fully herein.

ANSWER:     Avidia incorporates by reference its answers to each of the paragraphs above, as if fully stated herein.

19

71.     Defendants Avidia and KBW's conduct falls under the shadow of some established concept of unfairness.

ANSWER:     Avidia denies the allegations in Paragraph 71.

72.     The allegations underlying Plaintiff's claims against Defendant Avidia for breach of contract, breach of the implied covenant of good faith and fair dealing, and promissory estoppel are all allegations of unfair business practices, and each of those causes of actions represents an established concept of unfairness.

ANSWER:     Avidia denies the allegations in Paragraph 72.

73.     The allegations underlying Plaintiff's claims against Defendant KBW for intentional interference are, similarly, all allegations of unfair business practices, and each of those causes of actions represents an established concept of unfairness.

ANSWER:     Avidia denies the allegations in Paragraph 73.

74.     Defendants' actions were immoral, unethical, and unscrupulous. Defendants each chose to ignore Plaintiff's rightful stock order to enrich themselves, which is immoral, unethical, and unscrupulous.

ANSWER:     Avidia denies the allegations in Paragraph 74.

75.     Defendants' actions were also oppressive. Both Avidia and KBW leveraged their dominant financial position relative to Plaintiff, a private individual who merely sought to capitalize on his rights as a depositor in Avidia Bank, to enrich themselves. Defendants knew that it was unlikely that a single depositor would have the resources to fully pursue their claims in court, so, they acted with impunity for their own benefit, at the direct expense of Plaintiff.

ANSWER:     Avidia denies the allegations in Paragraph 75.

76.    Plaintiff, a customer and owner of Avidia Bank, was substantially injured. Defendants Avidia and KBW's actions prevented Plaintiff from receiving the benefit of the contract he entered or from otherwise participating in the Subscription Offering as was his right. Because Avidia's stock price has increased substantially since the Subscription Offering, Plaintiff has lost out on over $100,000 in returns.

ANSWER:    Avidia denies the allegations in Paragraph 76.

77.    Consistent with the process required by M.G.L. c. 93A, Plaintiff sent demand letters to both Defendants over thirty days ago. Both Defendants denied Plaintiff's demand for relief.

ANSWER:    Avidia admits the allegations in Paragraph 77 to the extent that they apply to Avidia.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Michael Williamson demands:

1.    Judgment in favor of Plaintiff and against Avidia and KBW on all Counts;

2.    Damages in an amount to be proved at trial, including pre-award and post-award interest; and

3.    Such other relief at law or equity that the Court deems just and proper.

ANSWER:    No response is required to the "Prayer for Relief" section of the Amended Complaint. To the extent a response is required, Avidia denies that Plaintiff is entitled to any of the relief sought in in the Prayer for Relief, including subparts (1) through (3).

## AVIDA BANCORP, INC.'S AFFIRMATIVE DEFENSES

1.    The Amended Complaint should be dismissed because Plaintiff fails to state a claim against Avidia upon which relief can be granted.

21

2.     Plaintiff's claims against Avidia are barred, or recovery on such claims must be proportionately reduced because of, the acts or omissions of Plaintiff, through principles of contributory or comparative negligence.

3.     To the extent Plaintiff has suffered any damages, he failed to mitigate those damages.

4.     Any injuries or damages Plaintiff suffered were not caused by any conduct on the part of Avidia, but instead were the result of an intervening and superseding cause.

5.     Any injuries or damages Plaintiff suffered were caused by the actions or omissions of the United States Postal Service or other third parties.

6.     Avidia reserves the right to assert additional defenses.

AVIDIA BANCORP, INC.
By its attorney,

/s/*Melanie V. Woodward*
Melanie Woodward (BBO# 690906)
MWoodward@nutter.com
Nutter, McClennen & Fish, LLP
Seaport West, 155 Seaport Blvd.
Boston, Massachusetts 02210
Telephone:   (617) 439-2000
Dated:  February 2, 2026           Facsimile:   (617) 310-9000

## CERTIFICATE OF SERVICE

I certify that, on February 2, 2026, I served a copy of the above document upon Michael Williamson by email.

22

23

/s/ Melanie Woodward
Melanie V. Woodward

7793929.1